**FILED**

AUG **1 6** 2007

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HELEN MCGEE, on behalf of herself and all
others similarly situated in the District of
Columbia,

*Plaintiff,*

vs.

NVIDIA CORPORATION; ATI
TECHNOLOGIES, INC.; and ADVANCED
MICRO DEVICES, INC.,

*Defendants*

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Case: 1:07-cv-01478
Assigned To : Robertson, James
Assign. Date : 8/16/2007
Description: Antitrust

Plaintiff Helen McGee hereby brings this action on behalf of herself and all other
similarly situated persons and entities who indirectly purchased certain graphics processing units
during a period beginning no later than December 1, 2002, and continuing to the present.
Plaintiff seeks damages and other relief from Defendants for violations of D.C. Code § 28-4501,
et seq. and §§ 28-3901, et seq., and common law, as well as federal injunctive relief under
Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15
U.S.C. § 1. Plaintiff, upon personal knowledge as to her own acts and status, and upon
information and belief as to all other matters, alleges the following:

**INTRODUCTION AND DEFINITIONS**

1.     This case arises out of a long-running conspiracy extending from at least
December 1, 2002 and continuing to the present (the "Class Period") among Defendants, with
the purpose and effect of fixing prices, allocating market share, and committing other unlawful
practices designed to inflate the prices of GPUs sold indirectly to Plaintiff and other purchasers
in the District of Columbia. Plaintiff brings this Class Action pursuant to the statutes of the

District of Columbia and the United States: D.C. Code §§ 28-4501, et seq. and §§ 28-3901, et seq., and Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      Graphics processing units ("GPUs"), also sometimes referred to as "visual processing units" or "VPUs", are highly specialized semiconductors that function as dedicated graphics rendering devices in computers.   These devices have become ubiquitous, finding application in virtually every computer system that must display images and/or text.  In personal computers, GPUs are generally installed in computers either directly on the motherboard (as part of the motherboard's chipset), or as add-in graphics cards, defined below.  For the purpose of this Complaint, "GPU" refers only to those GPUs used in Graphics Cards, as defined below.

3.      Graphics cards, which are also variously referred to as "graphics accelerator cards," "video cards," and/or "display adaptors," are a type of computer hardware whose function is to generate and output images to a display device, such as a computer monitor.  As used in this Complaint, "Graphics Cards," are separate, dedicated expansion cards that may be plugged into a slot in a computer's motherboard and contain their own dedicated memory, rather than relying solely on the motherboard's random access memory, or RAM.

4.      As used in this Complaint, "GPUs" and "Graphics Cards" refer only to those devices that are used in desktop, mobile, and mainframe computers, workstations, and servers, in the manner described above.  Excluded at this time are other electronic devices that may use graphics processing units, such as, gaming consoles, handheld personal digital assistants (PDAs), and mobile telephones.

5.      Defendants have formed an international cartel to illegally restrict competition in the GPU market, targeting and severely burdening consumers throughout the United States, including those in the District of Columbia.  The conspiracy has existed at least during the Class

2

Period, and has affected billions of dollars of commerce for products commonly found in households and businesses throughout the United States, including the District of Columbia.

6.      The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants, the substantial terms of which were and are to fix, stabilize, and maintain prices, allocate markets and customers, and coordinate price increases of GPUs and Graphics Cards throughout the United States, including in the District of Columbia.

7.      The acts by Defendants in furtherance of the conspiracy have included the following wrongful conduct and horizontal agreements:

   a.    participating in meetings and conversations in which Defendants discussed and agreed to prices for GPUs;

   b.    participating in meetings and conversations in which Defendants allocated markets and customers for GPUs;

   c.    participating in meetings and conversations in which Defendants discussed and agreed to refrain from engaging in competitive bidding or to submit complementary and non-competitive bids for particular contracts to supply GPUs and Graphics Cards to various consumers;

   d.    exchanged sales and customer information for the purposes of monitoring and enforcing adherence to the agreements reached;

   e.    issuing price announcements, price quotations, and general price increases in accordance with the pricing and market allocation agreements reached; and

   f.    facilitating, effectuating, implementing, monitoring, and concealing the contract, combination, and conspiracy to raise the prices of GPUs sold.

## JURISDICTION AND VENUE

5.      Plaintiff brings this Class Action pursuant to D.C. Code §§ 28-4501, et seq. and §§ 28-3901, et seq.

6.      This Complaint is also filed under Section 16 of the Clayton Act, 15 U.S.C. § 26 to enjoin Defendants, and their officers, agents, employees, or representatives from engaging in

3

the unlawful contract, combination, and conspiracy to restrain trade or commerce of GPUs and Graphics Cards, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332. The matter in controversy exceeds $5,000,000 exclusive of interest and costs when the claims of individual class members are aggregated, and is between citizens of different states. Venue is proper in the United States District Court for the District of Columbia pursuant to 15 U.S.C. §15 and §22 and 28 U.S.C. §1391, as the Defendants reside, transact business or are found within this District, and/or a substantial part of the events giving rise to the Plaintiff's claims arose in this District.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 by virtue of Plaintiff's injunctive relief claims brought under the Clayton Act, 15 U.S.C. § 26. Jurisdiction is also proper under 28 U.S.C. § 1367 as all other claims arise from the same case or controversy as the Clayton Act claim.

9.    Personal jurisdiction comports with due process under the United States Constitution and the District of Columbia's long-arm statutes.

10.    Without limiting the generality of the foregoing, Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) have:

   a.    transacted business in the District of Columbia;

   b.    contracted to supply or obtain services or goods in the District of Columbia;

   c.    availed themselves intentionally of the benefits of doing business in the District of Columbia;

   d.    produced, promoted, sold, marketed, and/or distributed their products or services in the District of Columbia and, thereby, have purposefully profited from their access to the District of Columbia's markets;

4

e.   caused tortious damage by act or omission in the District of Columbia;

f.   caused tortious damage in the District of Columbia by acts or omissions committed outside such jurisdiction while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

g.   committed acts and omissions which Defendants knew or should have known would cause damage in the District of Columbia to Plaintiff and Class members while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

h.   engaged in a conspiracy with others doing business in the District of Columbia that caused tortious damage in the District of Columbia; and

i.   otherwise had the requisite minimum contacts with the District of Columbia obtaining the benefits of its laws and markets such that, under the circumstances, it is fair and reasonable to require Defendants to come to this Court to defend this action.

11.    Plaintiff Helen McGee is a resident of the District of Columbia.  In addition, a substantial part of the trade and commerce, as well as the arrangement, contract, agreement, trust, combination, conspiracy, unfair or deceptive practices, and/or uniform and common course of conduct giving rise to Plaintiff's claims, occurred within the District of Columbia, including, among other things, the indirect sale of GPUs and Graphics Cards to Plaintiff and other members of the class at supra-competitive prices.

12.    As a result of the manufacture, distribution, delivery and sale of Defendants' products to indirect purchasers within the District of Columbia, Defendants obtained the benefits of the laws of the District of Columbia and the markets of the District of Columbia for their products.

# PARTIES

## A.    Plaintiff

13.    Plaintiff Helen McGee is a resident of the District of Columbia. During the time period covered in this Complaint, Plaintiff indirectly purchased GPUs from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for GPUs and has been injured by reason of the illegal conduct alleged herein.

## B.    Defendants

14.    Defendant Nvidia Corporation ("Nvidia") is incorporated in Delaware with its principal place of business at 2701 San Tomas Expressway, Santa Clara, California 95050. Defendant Nvidia produced GPUs for, and/or promoted, sold, marketed, and/or distributed GPUs to consumers throughout the United States, including the District of Columbia, during the Class Period. While Nvidia has indicated that it has four major product line operating segments, this action concerns what it refers to as its "GPU Business," consisting primarily of its GeForce, GeForce Go, Quadro and Quadro Go families of GPUs. It works closely with original equipment manufacturers ("OEMs") of computers, original design manufacturers ("ODMs") and add-in board manufacturers to define the product features, price and timing of its new products. Many of these manufacturers are so-called "Nvidia Authorized Board Partners," whom Nvidia can exercise control over through its "Nvidia PartnerForce Program." Pursuant to this program, Nvidia has the discretion to provide cooperative marketing funds and other marketing assistance to board partners and distributors. Nvidia has also been known to set product launch rules regarding the introduction of Graphics Cards manufactured by others that incorporate its GPUs.

15.    Defendant ATI Technologies, Inc.  ("ATI") is a Canadian corporation with its principal place of business at 1 Commerce Valley Drive East, Markham, Ontario, Canada L3T

7X6.  Defendant ATI produced GPUs for, and/or promoted, sold, marketed, and/or distributed GPUs to consumers throughout the United States, including the District of Columbia, during the Class Period.  In October of 2006, ATI became an indirect, wholly owned subsidiary of AMD. Since the acquisition by AMD of ATI, AMD has pursued an integration plan that includes the transfer of ATI employees and the closure of duplicative facilities. During the Class Period, ATI had subsidiaries located in California (ATI Research, Inc.; ATI Technologies Systems Corp.; and ATI Research Silicon Valley, Inc.) that performed research and development ("R&D") and U.S. sales and distribution functions.  ATI serves, *inter alia*, what it refers to as its "PC segment"— 3D graphics, video and multimedia products used in desktop and notebook personal computers ("PCs") and in workstations and servers.  These products include the Radeon, Radeon Mobility, FireGL, FireMV, and All-in-Wonder GPUs and Graphics Cards incorporating those GPUs.

16.     Defendant Advanced Micro Devices, Inc. ("AMD") is incorporated in Delaware with its principal place of business at One AMD Place, P.O. Box 3453, Sunnyvale, California 94088-3453. Defendant AMD, through its acquisition of Defendant ATI, produced GPUs for, and/or promoted, sold, marketed, and/or distributed GPUs to consumers throughout the United States, including the District of Columbia, during the Class Period.  On October 25, 2006, AMD finalized its acquisition of ATI for $5.4 billion. As part of that acquisition, AMD assumed existing liabilities of ATI.  AMD is also responsible for any unlawful conduct perpetrated by ATI since the acquisition.

17.     The acts alleged against Defendants were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' business or affairs.

18.     Defendants are also liable for acts done in furtherance of the alleged conspiracy

7

by companies they acquired through merger or acquisition.

## CLASS ACTION ALLEGATIONS

19.    This action is brought by Plaintiff on behalf of herself, and pursuant to Rule 23 of

the Federal Rules of Civil Procedure, as representative of a class of similarly situated individuals

in the District of Columbia ("the Class").  In particular, Plaintiff asserts that a class action is

appropriate under Rule 23(b)(3).

20.    The Class is defined as:

> All persons or entities residing in the District of Columbia who
> indirectly purchased GPUs and/or Graphics Cards manufactured
> and sold by one or more of the Defendants during the Class Period.
> Excluded from the Class are: all federal, state, or local
> governmental entities; Defendants' subsidiaries and affiliates; all
> persons who purchased GPUs directly from any Defendant or from
> any other manufacturer of GPUs.

21.    Although the exact size of the Class is unknown, the total number of Class

members is estimated to be in the tens of thousands, as most District of Columbia computer

purchasers during the class period have purchased GPUs and Graphics Cards.  Based upon the

nature of the trade and commerce involved, joinder of all Class members would be

impracticable.

22.    Plaintiff's claims are typical of the claims of the Class, and Plaintiff will fairly

and adequately represent and protect the interests of the Class.  Plaintiff has no conflict with any

other Class member, and has retained competent counsel experienced in class action and antitrust

litigation.

23.    Common questions of law and fact exist, including:

   a.    whether Defendants conspired with each other to fix, raise,
         stabilize or maintain the prices of GPUs;

   b.    whether Defendants' acts constituted unlawful trade
         practices;

   c.    whether the combination or conspiracy caused the prices of
         GPUs to be higher than they would have been in the
         absence of Defendants' conduct;

   d.    the operative time period for the conspiracy;

8

e.   whether Defendants' conduct caused injury to Plaintiff and the Class, and if so, the appropriate measure of damages;

f.   whether Defendants actively concealed the violation alleged herein; and

g.   the appropriate nature of the class-wide equitable relief.

These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

24.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy described herein. The class action vehicle provides an efficient method for enforcement of the rights of the Plaintiff and the Class members, and such litigation can be fairly managed. Plaintiff knows of no unusual problems of management or notice.

25.   It is desirable for the claims of the Plaintiff and the Class members to be adjudicated in a single proceeding to provide all claimants with a forum in which to seek redress for the violations of the laws of the District of Columbia and the United States.

26.   The difficulties that may exist in the management of the class action are far outweighed by the benefits of the class action procedure.

## FACTUAL ALLEGATIONS

**A.    Manufacture, Marketing, and Sales of GPUs and Graphics Cards**

27.   As stated above, GPUs are highly specialized semiconductors that permit the rendering of digital images and/or increase the speed, complexity and visual quality of digital images that are then displayed on computer monitors and other display devices. GPU technology was introduced during the early 1960s in some of the earliest computer displays; however, it became more widely available during the early 1980s with the advent of the personal computer.

28.   Defendants market, and either manufacture GPUs and Graphics Cards, or cause

them to be manufactured. Graphics Cards are sold under the ATI and Nvidia brand names, as well as under the names of third-party licensed manufacturers.

29.     Consumers can buy Defendants' products indirectly from OEMs (such as, Dell Inc. ("Dell"), Gateway, Inc. ("Gateway"), Apple, Inc., and Hewlett-Packard Co. ("HP")) as Graphics Cards incorporated into their computers, as described above. Graphics cards sold through the OEM channel are typically branded only with the name of the manufacturer of the GPU on the card. Often, a Graphics Card will be upgraded either when configuring a purchase from a computer manufacturer, or as an aftermarket purchase.

30.     Consumers can also buy Graphics Cards as separate purchases via online retailers (such as, CDW.com, TigerDirect.com, and ZipZoomfly.com), or retailers that have physical retail sites (such as, CompUSA, Best Buy, Fry's Electronics, and Circuit City). Graphics Cards purchased from these retailers are often branded by third-party licensees.

31.     When GPUs and Graphics Cards are purchased by consumers as part of a computer purchase, they are distinct, physically discrete hardware elements of the computer that are traceable throughout the chain of distribution to the end user and do not undergo any significant alterations in their transit through that chain. Such GPUs typically bear the Nvidia or ATI logo, are identifiable by a part number, and typically bear a unique serial number that would permit such tracing. Graphics Cards also often have a part or serial number, either engraved on the card or printed on a sticker attached to the card. As a function of their design, Graphics Cards can be physically unplugged from a computer's motherboard, and interchanged or replaced.

32.     When Graphics Cards are indirectly purchased as part of an overall computer purchase, the consumer is often given a choice of selecting different Graphics Card options at

different price points, with those Graphics Cards that are marketed as having greater capabilities generally selling at higher prices than older or less advanced models. Such pricing and performance determinants include the type of GPU used, the amount and type of RAM installed on the Graphics Cards, the type of motherboard interface the Graphics Cards support (the Accelerated Graphics Port ("AGP"), the Peripheral Component Interconnect ("PCI"), or the newer Peripheral Component Interconnect Express ("PCIE")), and other features. At the high end of the spectrum, Graphics Cards can have suggested retail prices of over $800. The following examples are illustrative—

    a. As of August 10, 2007, one who wanted to purchase a Dimension 9150 from Dell's website had the option of buying a 256MB Nvidia e-GeForce 7300 GS PCIE graphics card for an additional $79, a 512MB ATI Radeon X1650 Pro PCI for an additional $179, or a 512MB ATI XTASY Radeon X1600XT PCI graphics card for an additional $239.

    b. As of August 10, 2007, one who wanted to purchase an XPS 720 from Dell's website had the option of upgrading the included 256MB Nvidia GeForce 8600 GTS card to a 768 MB Nvidia GeForce 8800 GTX graphics card for an additional $400, or a 768 MB GeForce 8800 Ultra graphics card for an additional $800.

    c. As of August 10, 2007, one who wanted to purchase an HP Pavilion a6100y PC from Hewlett Packard's website had the option of buying a 64MB Nvidia GeForce 7500LE card for $40 more, or a 128MB Nvidia GeForce 8300GS card for $70 more.

    d. As of August 10, 2007, one who wanted to purchase an HP Pavilion Media Center m8100y PC from Hewlett Packard's website had the option of buying a 256MB Nvidia GeForce 8400GS for and additional $100, or a 512MB Nvidia GeForce 8500G-T card for an additional $130.

    e. As of August 10, 2007, one who wanted to purchase a DX-430S from Gateway's website had the option of buying the 256MB Nvidia GeForce 7500LE card for $79 more, a 256MB 7600GT for $158 more, or a 320MB GeForce 8800 GTS card for $378 more.

    f. As of August 10, 2007, one who wanted to purchase an FX530XG PC from Gateway's website had the option of buying a 512MB ATI Radeon x1950 CrossFire card for $171 more.

33.    As illustrated above, Graphics Cards can be one of the significant cost components in the purchase price of a computer. A consumer who buys a computer containing a graphics card will typically have an invoice or order acknowledgment where the graphics option selected is a separate line item.

34.    Defendants' Graphics Cards are available in these various price ranges with substantially comparable features. It has been acknowledged by industry analysts that brand loyalty among graphics card users is minimal and no single vendor enjoys a substantial advantage in price or performance.

**B.    Defendants' Market Position and Pricing Conduct**

35.    The market for GPUs is highly concentrated. According to some industry reports, Nvidia leads with approximately 53% of the market, while ATI has approximately 47% of the market. The production of GPUs is thus oligopolisitc in nature, making communication and cooperation between putative competitors somewhat easier than it would be in markets with more producers.

36.    In October 25, 2006, Defendant ATI merged with Defendant AMD, combining ATI's strengths in graphics, chipsets and consumer electronics with AMD's expertise in microprocessors. Under the terms of the transaction, Defendant AMD acquired all of the outstanding common shares of Defendant ATI for a combination of approximately $4.3 billion in cash and 58 million shares of AMD common stock. All of ATI's patents and licensing agreements were also transferred to AMD.

37.    Defendant Nvidia stated in its Amended Annual Report filed with the U.S. Securities and Exchange Commission on November 29, 2006, that it is the "worldwide leader in programmable graphics processor technologies." According to the report, Nvidia earned approximately $2.375 billion in revenues. The revenues from its GPU business increased by

22.6% to $1.7 billion for fiscal year 2006 compared to $1.4 billion for the previous fiscal year.

38.    Defendant ATI also stated in its 2005 Annual Report that it is one of the world's leaders in graphics processor technology, earning $2.22 billion in revenues and selling 115 million units.

39.    The GPU market is conducive to the kind of anticompetitive practices alleged in this Complaint. The market is oligopolistic and is characterized by high technological barriers to entry including research and development expenses and manufacturing costs. These high barriers to entry are in part due to the capital-intensive nature of the GPU industry and the high volumes of production required to achieve economies of scale.

40.    Both ATI and Nvidia operate as "fabless" manufacturers. They outsource the production of GPUs and other components to other licensed companies, thereby avoiding the risks associated with maintaining extensive large manufacturing facilities, and potentially allowing them to maintain a greater manufacturing capacity than a company-owned facility would allow.

41.    During the Class Period, there was rising demand for GPUs and the Graphics Cards in which they were used. Given this demand one would have expected Nvidia and ATI to engage in significant price competition, which, as explained below, has not occurred.

42.    In recent years, graphics card sales have been estimated at billions of dollars annually. Since at least 2002, GPUs and Graphics Cards have been characterized by price stability and upward pricing trends. This has been the case even though prices of some major components used to make these products (e.g., semiconductors, RAM) have been declining during portions of the Class Period. In a truly competitive industry, one would have expected these lower component costs to result in reduced prices for Graphics Cards and GPUs.

13

43.    When ATI or Nvidia introduced a new GPU during the Class Period, each Defendant either set or suggested a retail price for Graphics Cards bearing that GPU; in the latter instance, ATI and Nvidia could enforce adherence to the suggested price through control over advertising or promotional funds. By, among other things, coordinating this suggested price point, Defendants could and did agree to directly fix and inflate the prices of GPUs and Graphics Cards charged to Plaintiff and Class members as defined herein. The following examples are illustrative—

a. In March of 2003, it was announced that the ATI Radeon 9800 GPU would go on sale that month in Graphics Cards priced around $400, and it was also announced that the Nvidia FX 5800 GPU would appear in Graphics Cards also made available in March of 2003, which were priced at $400 as well.

b. In April of 2003, it was announced that the ATI Radeon 9600 would be priced around $200; it was also announced that the Nvidia Geforce 5600 would appear in stores in April of 2003, priced at $200 as well.

c. An article published in December of 2003 shows that similar Graphics Cards remained similarly priced even several months after their release dates. The article shows ATI's 9600 XT and Radeon 9600 price at $200 and $150 respectively. The competing Nvidia GeForce FX 5700 Ultra and GeForce 5600 Ultra cards were similarly priced at $200 and $150.

d. In May of 2004, it was announced that ATI's Radeon X800 Pro would be available for a retail price of approximately $399, and it was announced that Nvidia's comparable graphics card, the GeForce 6800 GT, would be released in June of 2004 for a retail price of approximately $399 as well.

e. On August 12, 2004, Nvidia announced the release of the GeForce 6600 GT at a retail price of $199; the Radeon X600 XT had been released only a few months earlier and also was priced at $199.

f. In the second quarter of 2004, Nvidia released the GeForce 6800 Ultra for $499 while ATI released the Radeon X800 XT PE for $499 as well.

g. In July of 2005, the Nvidia GeForce 6200 GT with 256 MB of double data rate ("DDR") memory and 8X AGP was released at a price of $140. In April of 2005, the ATI Radeon 9550 was released, also featuring 256 MB DDR memory and 8X AGP, and also priced at $140.

h. In addition to the foregoing releases, Defendants have released other new products at similar times with similar capacity, at similar or identical recommended prices. These pricing announcements were advertised and published to consumers of GPUs and the Graphics Cards in which they are used in each of the fifty states and the District of Columbia.

44.    In a competitive market for GPUs and Graphics Cards, it would not be expected that rivals would introduce so many new products at similar times and identical prices as alleged above. This is because GPU design is a complex and an extremely expensive proposition. Many workers' hours and capital expenditures are used in R&D of new technologies.

45.    At any point in the R&D process, numerous factors can delay, halt, or speed up the process. In a competitive market, firms would inefficiently rush ahead in order to release a new generation product significantly ahead of a competitor in order to capture sales.

46.    Defendants' foregoing behavior is highly unusual, is contrary to how a competitive market would be expected to operate, and is indicative of collusion. Engaging in acts necessary to achieve such behavior would be against each defendant's individual self-interest absent an agreement to fix prices. However, if Defendants were colluding, then engaging in such behavior would be profitable and in each defendant's self-interest.

C.    **Conspiratorial Meeting and Related Conduct**

47.    On information and belief, the above pricing activities occurred in the context of meetings among representatives of ATI and Nvidia for the purpose of limiting price competition.

48.    In the spring or summer of 2003, representatives of ATI and Nvidia secretly met in an effort to slow the pace at which they released new graphics products. Such a slowdown was intended to limit price competition and improve the profit margins of both companies.

49.    Following these meetings, in October of 2003, Nvidia postponed the introduction of its NV40 graphics technology and ATI postponed the introduction of its R400 graphics

technology, both of which had previously been expected to be introduced that year. Both technologies were instead introduced within a few weeks of each other in April and May of 2004. Such a concurrent release of next-generation architecture for GPUs had not happened before.

50.    These agreements were facilitated by other practices. For instance, in 2004, ATI posted on its website a draft presentation marked as "Confidential" prepared by one of its executives that detailed future product development. The presentation contained internal notes by the presenter that commented on ATI's strategies, including some of those relating to Nvidia.

51.    Similarly, there exists a trade association—PCI-SIG, which stands for PCI Special Interest Group—that is responsible for PCIe industry standard input-output technology. Representatives of ATI and Nvidia joined the board of this group in 2005, but the two companies had been active members of PCI-SIG working groups for years before that. AMD has been on PCI-SIG's board since at least 2000. In 2002, various members of this group, including AMD, ATI and Nvidia, met secretly to discuss, ostensibly, development and implementation of the PCI standard. This meeting provided opportunities for representatives of ATI, Nvidia and/or AMD to conspire about the introduction and pricing of GPUs and the Graphics Cards in which they are used.

52.    This secret meeting among the members of PCI-SIG in 2002 was followed by numerous other meetings involving PCI-SIG members, including: (a) annual PCI-SIG Developers' Conferences held in San Jose, California (recent ones occurred on June 2-3, 2003; June 14-15, 2004; June 6-7, 2005; June 8-9, 2006; and May 21-22, 2007); (b) PCI-SIG Compliance Workshops, typically held in Milpitas or Santa Clara, California (recent ones occurred on May 15-19, 2006; August 21-25, 2006; December 4-8, 2006; and February 26-

March 2, 2007); (c) PCIe Technology Seminars or Technical Training Days typically held in

Milpitas, California (recent ones occurred on March 22, 2004; December 6, 2004; October 3,

2005; December 5, 2005; February 27, 2006; August 21, 2006; October 23, 2006; and February

26, 2007). These meetings provided opportunities for representatives of ATI, Nvidia and/or

AMD to conspire about the introduction and pricing of GPUs and the Graphics Cards in which

they are used.

      53.     Other trade associations in which ATI, Nvidia and/or AMD are members include

the following:

    a. The Fabless Semiconductor Association ("FSA") bills itself as the "voice of the global fabless business model" and holds an annual FSA Suppliers Expo and Conference, as well as "regional lunches" and a "Suppliers Forum & Networking Series." The FSA also encourages the opportunity to work with its member companies through "alliances." Prior to 2007, ATI and Nvidia held seats on FSA's board. Those memberships and the activities sponsored by FSA provided Defendants with opportunities to conspire on the introduction and pricing of GPUs and the Graphics Cards in which they are used.

    b. The Semiconductor Industry Association ("SIA") represents the U.S. Semiconductor industry. Its coalition includes AMD and Nvidia, who have representatives on its board. SIA members influence the industry agenda through participation on working committees. These activities provided Defendants with opportunities to conspire on the introduction and pricing of GPUs and the Graphics Cards in which they are used.

    c. The Video Electronics Standards Association ("VESA") supports and sets industry-wide display standards for computers and the consumer electronics industry. ATI was, and AMD and Nvidia are, members of this organization, and a former executive of ATI (now listed as a representative for AMD) serves on its board. VESA has various committees, which in turn sponsor various task groups that meet regularly. The activities of VESA provided Defendants with opportunities to conspire on the introduction and pricing of GPUs and the Graphics Cards in which they are used.

    d. The JEDEC Solid State Technology Association ("JEDEC") (formerly the Joint Electron Device Engineering Council) is the semiconductor engineering standardization body of the Electronic Industries Alliance, a trade association representing segments of the electronic industry. AMD and Nvidia are members of this group and have representatives on its various committees and

subcommittees, which meet regularly. ATI was a member of this group before being acquired by AMD. The JEDEC touts the benefits of membership in the organization as including the ability to "take advantage of networking opportunities" and "make valuable contacts throughout the industry." The activities of the JEDEC provided the Defendants with opportunities to conspire on the introduction and pricing of GPUs and the Graphics Cards in which they are used.

e.   The Khronos Group ("Khronos") is a member-funded industry consortium focused on the creation of open standard advanced programming interfaces ("API") enabling the authoring and accelerated playback of dynamic media on various platforms and devices. One of these APIs is OpenGL, the most widely adopted 2D and 3D graphics API in the industry. OpenGL was initially administered by the OpenGL Architecture Review Board ("ARB"), a consortium created in 1992 that included ATI and Nvidia. In September of 2006, ARB was folded into the OpenGL Working Group ("WG") under the auspices of Khronos. The WG has a Steering Group and multiple Technical Sub-Groups, some of which are chaired by representatives of Nvidia and AMD. These groups meet regularly to work out a "joint road map strategy" for OpenGL. ATI was, and AMD and Nvidia are, members of the ARB, WG, and Khronos. Khronos also sponsors events and participation in such industry gatherings as the annual SIGGRAPH conference and the annual Consumer Electronics Show. The activities of Khronos, ARB, and now WG, as well as these industry gatherings (and others, such as annual Game Developers Conferences like the one held on March 4-8, 2003 and March 22-26, 2004 or the 3GSM World Congress, held on February 23-26, 2004), provided the Defendants with opportunities to collude on the introduction and pricing of GPUs and the Graphics Cards in which they are used.

54.   The foregoing meetings enabled Defendants, among other things, to avoid the risks of competition with one another, to inflate new product prices, and to derive more revenues from their existing technologies before having to cut the price of their existing technologies by "obsoleting" them through one Defendant's release of a new generation of enhanced-technology GPUs.

55.   Defendants have thus been able to exclude competition and maintain their oligopoly over GPUs by colluding and conspiring to fix, raise, maintain, and/or stabilize prices and royalties. As a result of Defendants' misconduct and anti-competitive behavior, consumers have to pay supra-competitive prices for GPUs.

**D.    Department of Justice Investigation**

56.    The United States Department of Justice ("DOJ") recently launched an investigation into anticompetitive practices by GPU manufacturers.  On or about November 30, 2006, the DOJ subpoenaed Defendants Nvidia and AMD.

57.    Both AMD and Nvidia have publicly confirmed that they have received a subpoena in connection with potential antitrust violations related to graphic processors and cards. A spokesperson for Nvidia said that the DOJ requested records back to the 1990s, including market studies, volume price agreements and other documents.  The Nvidia spokesperson was quoted saying, "It's a fairly broad request."  Subsequently, AMD confirmed that the investigation conducted by the DOJ is a criminal one.  According to Chapter III, Section C.5 of the DOJ's *Antitrust Division Manual*, "[c]urrent Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price-fixing, bid rigging and horizontal customer and territorial allocations."

58.    Price fixing among manufacturers in the high-technology industry has also occurred in other product markets, as evidenced by the conspiracy in the Dynamic Random Access Memory ("DRAM") market and the most recent alleged conspiracies in the Static Random Access Memory and Liquid Crystal Display markets.  Richard Gordon, an industry analyst with Gartner Inc., noted that because there are few suppliers in the chip industry, and an open flow of communication between competitors and customers, who may not define price fixing the same way the DOJ does, "If the DOJ wanted to, it could just go down every line in the semiconductor industry and find the same issue."  Gordon was also quoted as comparing the DOJ's investigation of GPUs and Graphics Cards to its successful prosecution of manufacturers of DRAM, which has resulted in $731 million in criminal fines.

59.    Other analysts have offered similar comments. "I have to believe this stuff traces back into history," said Doug Freeman, an analyst with American Technology Research. "...I have noticed that the price points of video cards have always been pretty equal. The first mover comes out with a product that is $500 and the follower comes out with a product that is $500. They tend not to be in price wars." Ashok Kumar, an analyst with Raymond James, said the Justice Department was possibly alerted by customers, such as PC makers or the so-called white-box clone PC makers based in Taiwan who try to keep their prices as low as possible.

E.    **Summary**

60.    Defendants, through their officers, directors and employees, have willfully and flagrantly effectuated their aforesaid contract, combination, trust or conspiracy between themselves and their co-conspirators by, among other things:

    a.  participating in meetings and conversations, including through various trade associations and committees, to discuss the prices of GPUs and Graphics Cards in the United States, including the District of Columbia;

    b.  agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of GPUs and the Graphics Cards in which they are used that are sold in the United States, including the District of Columbia;

    c.  issuing product and price announcements and quotations in accordance with the agreements reached;

    d.  selling GPUs to manufacturers of Graphics Cards in the United States, including the District of Columbia, at supracompetitive prices; and

    e.  engaging in unfair, deceptive and unconscionable practices targeting consumers of GPUs and the Graphics Cards in which they are used in each of the fifty states and the District of Columbia.

## TRADE AND COMMERCE

61.    The activities of Defendants, as described herein, were within the flow of, were intended to, and did have a substantial effect on the commerce of GPUs throughout the United

States, including the District of Columbia.

62.    During the Class Period, Defendants manufactured and sold substantial quantities of GPUs to businesses and consumers throughout the United States, including the District of Columbia.

63.    The contract, combination, and conspiracy consists, upon information and belief, of a continuing agreement, understanding, and concert of action between and among Defendants, the substantial terms of which were and are to fix, stabilize, and maintain prices, allocate markets and customers, and to coordinate price increases for the sale of GPUs throughout the United States, including the District of Columbia.

64.    The acts in furtherance of the conspiracy by Defendants have included, on information and belief, the following wrongful conduct and horizontal agreements:

a.    participating in meetings and conversations on a periodic basis during the Class Period in which Defendants discussed and agreed to fix, raise, stabilize, and maintain the prices for GPU;

b.    participating in meetings and conversations on a periodic basis during the Class Period in which Defendants discussed and agreed to allocate markets and customers for GPU;

c.    participating in meetings and conversations on a periodic basis since at least during the Class Period in which Defendants discussed and agreed to refrain from engaging in competitive bidding, or to submit complementary and non-competitive bids, for particular contracts to supply GPUs and Graphics Cards to various customers;

d.    exchanging sales and customer information for the purposes of monitoring and enforcing adherence to the agreements reached;

e.    issuing price announcements, price quotations, and general price increases in accordance with the pricing and market allocation agreements reached; and

f.    facilitating, effectuating, implementing, monitoring and concealing the contract, combination, and conspiracy to raise the prices of GPUs sold.

65.    For the purposes of formulating and effectuating the aforesaid contract, combination, and conspiracy, Defendants did those things that they combined and conspired to do.

## IMPERMISSIBLE MARKET EFFECTS

66.    The contract, combination, and conspiracy alleged herein had the following effects, among others:

a.    prices paid by Plaintiff and the Class members for GPUs and Graphics Cards were fixed, raised, maintained, and stabilized at artificially high and noncompetitive levels;

b.    indirect purchasers of GPUs and Graphics Cards were deprived of the benefits of free and open competition; and

c.    competition between and among Defendants and their Co-Conspirators in the sale of GPUs and Graphics Cards was unreasonably restrained.

67.    As a result, Plaintiff and the Class members have been injured in their businesses and property in that they have not only been deprived the benefits of fair and open competition but have paid more for GPUs and Graphics Cards than they would have paid in the absence of Defendants' unlawful contract, combination, and conspiracy.

## PLAINTIFF'S INJURIES

68.    Plaintiff and the Class members have been damaged as a direct, foreseeable, and proximate result of Defendants' misconduct. Plaintiff and the Class members participate indirectly in the market for the sale of GPUs and Graphics Cards. To the extent Plaintiff and Class members purchased GPUs and Graphics Cards as part of a computer purchase, Defendants' unlawful conspiracy and unfair, deceptive and unconscionable practices have restrained the prices at which OEMs sell such GPUs and Graphics Cards.

69.    Defendants have extinguished the market forces of competition to their mutual benefit. Plaintiff and Class members are injured by paying supracompetitive prices for GPUs and Graphics Cards.

70.    Because Defendants control the market for GPUs and Graphics Cards, there are virtually no other choices for consumers who require such cards. The economic and legal literature has recognized that unlawful overcharges for products are normally passed on from manufacturers through distributors and retailers to end-users. Two antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the *Handbook of the Law of Antitrust*)—have observed that, "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule". As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor of Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in the California indirect purchaser litigation involving Microsoft Corporation, observed (in a passage quoted in the judicial decision in that case granting class certification):

> "As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly all of the overcharge will be passed through to ultimate consumers. ... This general phenomenon of cost pass through is well established in antitrust laws and economics as well."

71.    Plaintiff and the Class members have been forced to pay supracompetitive prices for Graphics Cards and the GPUs therein. These inflated prices have been passed on to them by manufacturers, distributors, and retailers. These overcharges have unjustly enriched Defendants.

## FRAUDULENT CONCEALMENT

72.     Throughout the Class Period, Defendants engaged in a successful, illegal price-fixing conspiracy that was by its nature self-concealing, and that effectively, affirmatively, and fraudulently concealed Defendants' unlawful combination, conspiracy, and acts in furtherance thereof from Plaintiff and the Class members.

73.     Although Plaintiff exercised due diligence throughout the Class Period, she could not have discovered Defendants' unlawful scheme and conspiracy at an earlier date because of Defendants' effective, affirmative, and fraudulent concealment of their activities. Defendants' wrongful conduct was designed and intended to avoid detection.

74.     Defendants' fraudulent concealment included public statements that falsely attributed natural reasons such as seasonal ebb and flow and a highly competitive market to their price increases of GPUs. Defendants also instructed their United States entities to offer similar false reasons to explain price increases to customers in the United States, including the District of Columbia. In fact, those increases were due to Defendants periodic withholding of the supply of GPUs to create an artificial supply shortage, which in turn generated a level of artificial demand, driving up prices.

75.     Plaintiff and the Class members had no reason to disbelieve Defendants' explanations of the pricing behavior of these products. Indeed, in some instances Defendants' explanations involved proprietary or otherwise non-public information within Defendants' exclusive control, leaving Plaintiff and the Class members without means to verify their accuracy. Plaintiff did not know nor could she have known that Defendants' prices for GPUs were artificially inflated and maintained by virtue of Defendants' illegal price-fixing conspiracy and that Plaintiff and the Class members were paying higher prices for GPUs and Graphics

Cards than they would have paid in a competitive market.

76.    Plaintiff has exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy, and by seeking discovery as to the matters asserted herein, to the extent permitted by law.

## COUNT I
### (Violation of District of Columbia Antitrust Act)

77.    Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as fully set forth herein.

78.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which GPUs were sold, distributed or obtained in the District of Columbia, and thus violated the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, et seq.

79.    By reason of Defendants' combination or conspiracy in restraint of trade in the District of Columbia, Plaintiff and other Class members who indirectly purchased GPUs have been injured, because, among other reasons, they have paid more for GPUs and Graphics Cards than they would have paid in the absence of the Defendants' combination or conspiracy in restraint of trade and/or deceptive acts or practices.

80.    Plaintiff and Class members in the District of Columbia have been and will continue to be injured in their business and property by Defendants' combination or conspiracy in restraint of trade.

81.    As a result of Defendants' combination or conspiracy in restraint of trade, Plaintiff and the Class have sustained, and will seek damages, in an amount to be determined at trial.

## COUNT II
### (Violation of the Consumer Protection Procedures Act)

82. Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as fully set forth herein.

83. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which GPUs were sold, distributed or obtained in the District of Columbia. Defendants intentionally misled consumers as to the reasons for said prices.

84. Defendants' foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

85. Defendants' unlawful conduct had the following effects:

   a.  GPU price competition was restrained, suppressed, and eliminated throughout the United States, including in the District of Columbia;

   b.  GPU prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the United Stated, including in the District of Columbia;

   c.  Plaintiff and members of the Class were deprived of free and open competition; and

   d.  Plaintiff and members of the Class paid supra-competitive, artificially inflated prices for GPUs.

86. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the District of Columbia Indirect Purchaser Class have been injured. As a result of Defendants' violation of D.C. Code §§ 28-3901, et seq., Plaintiff, on behalf of herself and the Class members, seeks treble damages or $1,500 per violation, whichever is greater, punitive damages, injunctive relief, reasonable attorneys' fees, and any additional relief as may be necessary to restore to the

consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice, pursuant to D.C. Code §§ 28-3905(k).

## COUNT III
### (Unjust Enrichment and Disgorgement of Profits)

87.    Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as fully set forth herein.

88.    Defendants benefited from their unlawful acts as a result of the overpayment for GPUs and Graphics Cards by Plaintiff and the Class members. Moreover, Defendants were aware of, and accepted this benefit. Taken together, Defendants' actions worked to unjustly enrich the Defendants.

89.    Under District of Columbia unjust enrichment law, and common law principles of unjust enrichment, it would be inequitable for Defendants to be permitted to retain the benefits of Plaintiff's overpayments, which were conferred by Plaintiff and Class members, and retained by Defendants. Therefore, Plaintiff seeks disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class members may seek restitution, as well as any and all other damages and other relief that the Court sees fit to award.

## COUNT IV
### (Injunctive Relief for Violation of the Sherman Act)

90.    Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as fully set forth herein.

91.    Beginning by at least December 1, 2002 and continuing to the present, Defendants have entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for GPUs in the District of Columbia and

throughout the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

92.    Defendants' conduct in restraint of trade has the intent, and effect, of maintaining artificially high, and anticompetitive prices of GPU.

93.    Defendants did and continue to do those things they have colluded and conspired to do, including, but not limited to, the allegations set forth herein.

94.    Defendants' illegal combination and conspiracy as alleged herein has the effect of (i) restraining, suppressing and/or eliminating competition; (ii) artificially fixing, raising, maintaining, and/or stabilizing prices at high, supra-competitive levels; and (iii) depriving consumers of free and fair competition on the merits.

95.    It is in the best interest of the public to enjoin, pursuant to the Clayton Act, 15 U.S.C. § 26, Defendants and their officers, agents, employees, or representatives from engaging in the unlawful contract, combination, and conspiracy in restraint of trade or commerce of GPU.

96.    Plaintiff and the Class have and will continue to be injured by Defendants' conduct in violation of the antitrust laws of the United States and D.C. Code §§ 28-4501, et seq., in the absence of injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, and respectfully requests the Court:

1.    Certify this action to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    Adjudge and decree that the unlawful conduct, contract, conspiracy or combination alleged herein was or were—

    a.    Acts in violation of D.C. Code §§ 28-4501, et seq., identified in the First

28

Count for Relief herein;

    b.   Acts in violation of D.C. Code §§ 28-3901, et seq. identified in the Second Count for Relief herein;

    c.   Acts of unjust enrichment as set forth in the Third Count for Relief herein; and

    d.   Acts in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.    Award Plaintiff and Class members actual, statutory, and punitive damages in an amount to be proved at trial;

4.    Award Plaintiff and Class members restitution and disgorgement of profits obtained by Defendants as a result of their violations of common law principles prohibiting their acts of unfair competition and acts of unjust enrichment;

5.    Award Plaintiff and Class members the costs of the suit, including reasonable attorney's fees;

6.    Award Plaintiff and the Class members a permanent injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants, and their officers, agents, employees, or representatives from engaging in this unlawful contract, combination, and conspiracy in restraint of trade or commerce and any other violations of Section 1 of the Sherman Act;

7.    Award Plaintiff and the Class members pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law; and

8.    Grant such other, further or different relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims for which she is entitled to a jury trial.

DATED:  August 16th, 2007

By: _____
Timothy D. Battin
District of Columbia Bar (Bar Number 436303)
Straus & Boies, LLP


Timothy D. Battin
STRAUS & BOIES, LLP
4041 University Drive, Fifth Floor
Fairfax, Virginia 22030
Telephone:  (703) 764-8700
Facsimile:  (703) 764-8704

*Attorney for Plaintiff Class*

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Helen McGee | NVIDIA CORPORATION; ATI TECHNOLOGIES, INC., ADVANCED MICRO DEVICES, INC. |

*11001*

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __11001__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Timothy D. Battin
Straus & Boies, LLP
4041 University Dr., 5th Floor
Fairfax, VA 22030

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01478
Assigned To : Robertson, James
Assign. Date : 8/16/2007
Description: Antitrust

*JURY ACTION*

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**◉ A. Antitrust**
- ☒ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**   OR   **○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

*③*

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Antitrust activities and unfair trade practices violating D.C. Code § 28-4501, et seq., D.C Code §§ 28-3901, et seq., 15 U.S.C. § 26, and 15 U.S.C. § 1

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23 | **DEMAND $** [_____] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** | YES ☒    NO ☐ |

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE  August 16, 2007  SIGNATURE OF ATTORNEY OF RECORD  *(signature)*  DC Bar # : 436303

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.